28 F.3d 113
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Judith SIMS, Tamara Mason, Plaintiffs-Appellants,
v.
KCA, INC.; Charles Puckett; James Wall, Defendants-Appellees,
and
Nancy NANCE, Defendant.
 No. 93-2053.
 United States Court of Appeals, Tenth Circuit.
 June 17, 1994.
 
 1
 Before BRORBY and EBEL, Circuit Judges, and KANE,** District Judge.
 
 ORDER AND JUDGMENT[1]
 
 2
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.
 
 
 3
 Plaintiffs Judith Sims and Tamara Mason brought this action against defendants KCA Corporation, James Wall, Charles Puckett, and Nancy Nance, claiming intentional race discrimination in employment in violation of 42 U.S.C.1981 and 2000e-16. After the close of plaintiffs' case before a jury, the district court granted defendants' motion for judgment as a matter of law as to defendant Nance on all claims and denied the motion as to defendants Wall, Puckett, and KCA. The jury entered a verdict in favor of the remaining defendants.
 
 
 4
 Plaintiffs appeal, raising two grounds for their request for reversal: (1)the district court erred in granting Nance judgment as a matter of law at the conclusion of plaintiffs' case; and (2) the district court erred in denying plaintiffs' motion for new trial against all defendants. We affirm.
 
 I. Background
 
 5
 On October 1, 1989, defendant KCA Corporation acquired the government food services contract to manage the two dining halls on Kirtland Air Force Base, New Mexico. Plaintiffs in this case were employees of the previous contract holder, Western States Management. Sims, a Caucasian, had been employed in food service at Kirtland for over ten years and was a shift supervisor for the El Dorado dining hall. Mason, a Caucasian, had been employed by Western States for one and one-half years in a "KP" position in the El Dorado dining hall. Defendant Nance, a Korean, was hired two years after Sims and held the position of shift supervisor for the Thunderbird dining hall.
 
 
 6
 During the week before the KCA takeover, Kin Cha Anderson, president of KCA, together with defendants Puckett, general manager of KCA, and Wall, contract manager for KCA, arrived at Kirtland to observe the Western States operation, to inventory the equipment, and to generally facilitate the transfer. Wall and Puckett also were authorized to hire the employees necessary to carry out the KCA contract.
 
 
 7
 All of the employees of Western States were required to apply for reemployment with KCA. Sims and Mason both applied for the same positions they held under the Western States contract. Neither plaintiff was hired. Nance was hired by KCA as a shift supervisor and then promoted to assistant manager. There was conflicting testimony as to when during the course of the KCA takeover Nance assumed these positions.
 
 
 8
 Plaintiffs contend that they were not hired by KCA because they are Caucasian. They alleged that Nance was biased against Caucasians as evidenced by her alleged discriminatory remarks, and that she influenced the KCA hiring decisions made by Wall and Puckett.
 
 
 9
 At the close of plaintiffs' case, defendants moved for judgment as a matter of law on the ground that Sims allegedly falsified her application. Appellants' App. Vol. I at 25. Defendants claimed that Sims stated on her application that she graduated from high school when in fact she acquired her diploma by GED. See Appellees' Supp.App. at 1. Defendants claim that, had KCA known about this "falsification," Sims "would have been terminated." Appellants' App. Vol. I at 25. Defendants further argued that plaintiffs failed to testify specifically that they were discriminated against on the basis of their race. Id. at 26-27. Neither of these grounds formed the basis for the district court's decision.
 
 
 10
 In granting defendants' motion as to Nance, the district court concluded that plaintiffs had not "proved anything against Ms. Nance." Appellants' App. Vol. II(C) at 449-50. As to Wall and Puckett, the court found that "there's enough testimony to keep them in to go to the jury, as there is in the corporation." Id.
 
 
 11
 The defendants then rested their case without presenting any evidence or testimony. Id. at 450. In a side bar decision, the court restricted counsel from commenting on Nance's alleged discriminatory remarks or her alleged involvement in the hiring process in closing arguments. Id. at 462, 476. Counsel for plaintiffs did not object to this ruling.
 
 II. Standard of Review
 
 12
 Federal Rule of Civil Procedure 50(a)(1)[2] allows the district court to grant a motion for judgment as a matter of law "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Grant of judgment as a matter of law is appropriate "only if the evidence, viewed in the light most favorable to the nonmoving party, 'points but one way and is susceptible to no reasonable inferences supporting' the nonmoving party." Riggs v. Scrivner, Inc., 927 F.2d 1146, 1149 (10th Cir.) (quoting Zimmerman v. First Fed. Sav. & Loan Ass'n, 848 F.2d 1047, 1051 (10th Cir.1988)), cert. denied, 112 S.Ct. 196 (1991). The court is not permitted to evaluate the credibility of witnesses, weigh the evidence, or determine where the preponderance of evidence lies. Martin v. Unit Rig & Equip. Co., 715 F.2d 1434, 1438 (10th Cir.1983). However, because the evidence must be more than a mere scintilla, the court is allowed to evaluate the evidence to the extent of determining whether there is sufficient evidence to support a jury verdict for the plaintiff. Honce v. Vigil, 1 F.3d 1085, 1088 (10th Cir.1993).
 
 
 13
 "The standard of review of the court's order sustaining the motion for directed verdict under Fed.R.Civ.P. Rule 50 is de novo." Fry v. Board of County Comm'rs, 7 F.3d 936, 938 (10th Cir.1993). This court has concluded that directed verdicts must be granted with caution. Martin, 715 F.2d at 1438. In sum, a directed verdict is appropriate only where "the evidence points all one way." Wylie v. Ford Motor Co., 502 F.2d 1292, 1294 (10th Cir.1974.). In the case of conflicting evidence or insufficient evidence to support a "one-way conclusion," a judgment as a matter of law is inappropriate. Martin, 715 F.2d at 1438.
 
 III. Discussion
 
 14
 "To survive a directed verdict, plaintiff must establish a prima facie case of discrimination." Honce, 1 F.3d at 1089. A plaintiff meets this burden by demonstrating
 
 
 15
 (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
 
 
 16
 McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).[3] Once the plaintiff has established a prima facie case, the burden of production shifts to the employer to set forth legitimate, nondiscriminatory reasons for the adverse employment action. McDonnell Douglas Corp., 411 U.S. at 802. Once the employer meets its burden of production, the McDonnell Douglas framework is no longer relevant, and the plaintiff bears the ultimate burden of persuasion that the employer's adverse employment decision was the result of intentional discrimination. St. Mary's Honor Ctr. v. Hicks, 113 S.Ct. 2742, 2749 (1993).
 
 
 17
 Although the Supreme Court has not addressed the issue, this court has joined several other circuits in modifying the McDonnell Douglas standard in reverse discrimination cases, to require the plaintiff who seeks to obtain the benefits of the McDonnell Douglas presumption to establish, "in lieu of showing that he belongs to a protected group, ... background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." Notari v. Denver Water Dep't, 971 F.2d 585, 589 (10th Cir.1992); see also Parker v. Baltimore & Ohio R.R., 652 F.2d 1012, 1017 (D.C.Cir.1981) (plaintiff must establish that background circumstances exist which would support the suspicion that the defendant is the unusual employer who discriminates against the majority).
 
 
 18
 In Notari, we held that a failure to allege background circumstances which would suggest that defendant had a history of discrimination against a majority does not necessarily defeat a plaintiff's opportunity to prove reverse discrimination. 971 F.2d at 589. In a discrimination action involving a minority, the plaintiff has the additional alternative of providing direct proof of discriminatory intent in lieu of relying on the McDonnell Douglas presumption. Id. Providing the historically advantaged plaintiff with the same alternative, this court held that "[a]n employee who is the victim of intentional [reverse] discrimination ... and who adduces sufficient evidence of that discrimination, should be permitted to proceed beyond the prima facie case stage of litigation." Id. at 590.
 
 A.
 
 19
 At trial, plaintiffs sought to show discriminatory intent in KCA's failure to hire them by presenting testimony that Nance was overheard on several occasions making remarks which would indicate a bias against Caucasian workers, and in particular, a preference for Korean workers. Sims testified that sometime in 1987 or 1988, while she was working under Nance's supervision, she overheard Nance make a comment that "Koreans were better workers," followed by a remark exempting Sims from that characterization. Appellants' App. Vol. II(A) at 57-58. Sims further testified that at this same time Nance appeared to be favoring a Korean employee who did not speak English and was "very slow." Id. at 59. Sims stated that when she complained to Nance, Nance was upset with her and accused her of "picking on" this employee. Id. She further testified that it "appeared" that while Nance was in control, more Koreans had the preferred morning shift, in particular an employee named Iranda Kim, who may not have merited the shift if the shifts were being bid by seniority. Id. at 60-61. Kathleen McGhee (Long), the third Caucasian not hired by KCA, testified that she heard Nance remark that "she didn't like working with white people because they weren't as good of workers as the Orientals were."[4] Id. at 132.
 
 
 20
 Larry Franklin, project supervisor under the Western States contract, testified that when the former project supervisor was fired for poor performance, Nance was in charge on a temporary basis. Appellants' App. Vol. II(B) at 300. Franklin stated that after he was hired as project supervisor, employees expressed concern to him regarding the predominately Asian makeup of the morning shift under Nance's supervision, id. at 301, a condition that changed after Franklin instituted a seniority system for shift assignment, id. at 302-03. Franklin testified that although no formal complaints were lodged, Kerry Love, a shift supervisor who was also the union shop steward, had conversations with Franklin regarding the "jokes" about the racial makeup of the people who would be hired by KCA. Id. at 314.
 
 
 21
 Nance denied ever making the alleged remarks that Koreans were better workers. Id. at 321-22. She did, however, admit to "joking" about the performance of the employees based on race. Id. at 322-23.
 
 B.
 
 22
 This court has held that absent a demonstrated nexus between discriminatory remarks and the challenged personnel decision, such remarks are only "stray," isolated remarks which are insufficient to establish discriminatory animus. Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 531 (10th Cir.1994). In order to link Nance's alleged discriminatory animus to KCA's failure to hire plaintiffs, plaintiffs contend that, because Nance was placed in an influential position prior to the final hiring decisions, her alleged preference for Koreans over white workers influenced KCA's hiring process. In response, defendants contend that, regardless of whether Nance held strong discriminatory opinions regarding Caucasian workers, Nance was never consulted regarding hiring, and all hiring decisions were made solely on the basis of observations of performance by Puckett and Wall.
 
 
 23
 On appeal, defendants also maintain that Nance was not in a position to influence hiring decisions because she was not hired as shift supervisor until September 30, the same day as the other employees were hired, and was not promoted to assistant manager until October 2, after the hiring was completed. On this point, both Wall and Puckett testified inconsistently.
 
 
 24
 Wall testified at trial that Nance was initially hired as shift supervisor on September 30, and promoted to assistant manager on October 2. Appellants' App. Vol. II(A) at 153. This testimony conflicts with an earlier affidavit in which Wall stated that Nance was hired as assistant manager initially. Id. at 156. In explanation of this inconsistency, Wall claims he "misspoke" in the affidavit. Id. at 157.
 
 
 25
 Puckett testified that Nance was not hired as shift supervisor until September 29. Appellants' App. Vol. II(B) at 257-58. In a prior affidavit, Puckett stated that Nance was hired as assistant manager on October 1. Id. at 260. Puckett then stated he had "a little confusion with times," and that "assistant managers" and "shift leaders" are the same. Id. at 260-61. Puckett's trial testimony also was inconsistent with a previous deposition statement that Nance was hired during the week prior to the KCA takeover to help with a "smooth transition."[5] Id. at 254-55.
 
 
 26
 The trial transcript indicates additional conflicting testimony regarding the contact Nance had with Wall and Puckett during the week preceding the KCA takeover. Wall testified that he did not discuss KCA matters with Nance or have Nance assist in setting up a schedule. Appellants' App. Vol. II(A) at 158. However, in deposition, Wall admitted that he asked questions of Nance regarding the schedule. Id. at 158-59. Puckett stated at trial that he received information from Nance regarding scheduling, the number of meals served, and what personnel were needed. Appellants' App. Vol. II(B) at 293. However, he testified that his discussions with Nance did not include any discussion of Western States employees. Id. at 294.
 
 
 27
 Franklin testified that he observed Nance meeting with Wall, Puckett, and Kin Cha Anderson, president of KCA, on a daily basis during the week prior to KCA's takeover. Id. at 308-09. He further stated that he observed "KCA people" sitting at a table with Nance doing what he believed to be "looking at the employment records, the personnel files." Id. at 316.
 
 
 28
 Although Sims testified that she had no personal knowledge of Nance's involvement in the hiring process, she claims that she was told by Kerry Love, the shift manager, that Nance had met with Wall and Puckett to go over "lists." Appellants' App. Vol. II(A) at 90. Love, testifying in deposition,[6] stated that he observed Nance in "sit-down formal-type meeting[s]" with Wall and Puckett. Appellants' App. Vol. I at 39. He also testified that Nance asked him his opinion on whether certain persons on a list should be hired. Id. at 39-40. In addition, Love testified that during the week of transition, before KCA took over the contract, he was asked to put up nameplates on an office door with the names of Jim Wall and Nancy Nance. Id. at 45.
 
 
 29
 In direct contravention of the testimony of other witnesses, Nance denied even knowing that KCA was taking over the contract until September 30. Appellants' App. Vol. II(B) at 324. She claimed she had a conversation with Kin Cha Anderson, president of KCA, on September 26, in which they discussed the possibility of her working with Wall as assistant manager if KCA got the contract, id. at 325, but claims she only saw Wall and Puckett on September 26. She also denied any discussions with Love regarding who should be hired. Id. at 336.
 
 
 30
 The deposition testimony of Kin Cha Anderson was read into the record at trial. Contrary to Nance's testimony, Mrs. Anderson testified that during a conversation with Nance on September 26, they did not discuss the assistant manager position, id. at 357-59, although Mrs. Anderson admitted that she got the "impression" that Nance wanted the position, id. at 361.
 
 
 31
 In further support of their claim, plaintiffs offered the testimony of an expert statistician, Dr. Ron Gold Faich. Dr.Faich testified that he used the hiring facts of this case in a statistical technique called "Chi[2]." Appellants' App. Vol. II(C) at 424. Dr. Faich explained that
 
 
 32
 [Chi[2]] measures the probability that you would have a particular set of persons hired of the various races.
 
 
 33
 In other words, in a situation where you have 35 people hired, of the group that applied or was considered for these positions, if three are Anglo and 32 are Minority, what you do then is you look at who was, in fact, hired and their races.
 
 
 34
 Id. at 425. Dr. Faich opined that, assuming that the information on Exhibit 29, Appellants' App. Vol. I at 46, was correct as to the race of applicants from Western States and which were hired, there was a 1 in 1000 probability that race was not a factor in the hiring process. Id. at 431. He also testified that his statistical conclusion was based on race alone and did not include any factors based on performance. Id. at 437-38. He stated that his conclusions were based on this being a white versus non-white case, not a white versus Korean case. Id. at 441.
 
 
 35
 In reviewing a directed verdict in a discrimination case, an appellate court must determine " 'whether the evidence ... was sufficient to justify a reasonable jury in finding discrimination.' " Honce, 1 F.3d at 1088 (quoting Lowe v. J.B. Hunt Transp., Inc., 963 F.2d 173, 174 (8th Cir.1992)). Contrary to the district court's finding, it was not necessary for plaintiffs to prove discrimination in order to withstand defendants' motion for judgment as a matter of law. This court must determine only whether there was sufficient evidence, when viewed in a light most favorable to plaintiffs, to withstand defendants' motion for judgment as a matter of law on the ultimate issue of whether plaintiffs were the victims of reverse discrimination. See Pytlik v. Professional Resources, Ltd., 887 F.2d 1371, 1380 (10th Cir.1989).
 
 
 36
 As is demonstrated by the discussion above, this case involves conflicting evidence. The determination as to the credibility of the evidence was for the jury. In sum, the district court's conclusion that plaintiffs failed to "prove" anything against Nance required a weighing of the evidence impermissible in deciding the propriety of a judgment as a matter of law. See Martin, 715 F.2d at 1438. Therefore, viewing the evidence in a light most favorable to plaintiffs and resolving the conflicting evidence in their favor, the district court's grant of judgment as a matter of law to Nance was error. This determination, however, does not dispose of the issue.
 
 
 37
 " 'The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act.' " Sauers v. Salt Lake County, 1 F.3d 1122, 1125 (10th Cir.1993)(quoting Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir.1991)).[7] Suits against persons in their individual capacity are inappropriate under Title VII. Id. Therefore, although Nance may be found to have violated the prohibitions of Title VII, absent a determination that Nance was an employer, plaintiffs' claim against Nance personally under Title VII cannot be maintained.
 
 
 38
 As to Nance's possible personal liability under 1981, if there is "some affirmative link to causally connect the actor with the discriminatory action," a suit against an individual under 1981 can be predicated on the actor's personal involvement with the discriminatory action. Allen v. Denver Pub. Sch. Bd., 928 F.2d 978, 983 (10th Cir.1991). The issue of individual liability under 1981 has been addressed in several other forums. In Al-Khazraji v. Saint Francis College, 784 F.2d 505, 518 (3d Cir.1986), aff'd on other grounds, 481 U.S. 604 (1987), the court stated that "directors, officers, and employees of a corporation may become personally liable when they intentionally cause an infringement of rights protected by Section 1981, regardless of whether the corporation may also be held liable." See also Faraca v. Clements, 506 F.2d 956, 957 n. 2, 959 (5th Cir.) (holding director of state agency personally liable for discriminatory act even though employer was immune from liability), cert. denied, 422 U.S. 1006 (1975); Kolb v. Ohio Dep't of Mental Retardation & Developmental Disabilities, 721 F.Supp. 885, 891 (N.D. Ohio 1989)(holding that an individual actor may be held liable for intentionally interfering with contractual rights on the basis of race, "regardless of whether the employer or anyone else may also be held liable").
 
 
 39
 In light of these holdings, it would appear that plaintiffs continue to have a cognizable claim against Nance under 1981 regardless of the jury verdict in favor of KCA. However, such is not the case. For example, in Faraca v. Clements, a director was held personally liable under 1981 for a discriminatory employment decision even though the state agency employer was immune from liability. However, the difference between being immune from liability and being innocent of the acts underlying liability is palpable.
 
 
 40
 We could find no authority supporting a determination of liability against an individual under 1981 when the impediment to employer liability was a favorable verdict, absolving the employer of any discriminatory act. However, in a 1983 action against Elwood, Kansas, its police officers and its mayor, this court held that a municipality may not be held liable when there are no underlying constitutional violations by the municipality's officers. Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir.1993). Pointing to the distinction between finding that the alleged conduct did not violate constitutional rights and a finding of qualified immunity, we determined that this conclusion was not inconsistent with previous statements that a determination of qualified immunity does not preclude a finding of liability against the municipality. Id. Applying the same reasoning to this case, it is clear that regardless of whether Nance harbored discriminatory intent, if, as evidenced by the jury verdict, her intent did not adversely influence KCA, plaintiffs suffered no injury, and Nance's acts are not legally cognizable under 1981.
 
 B.
 
 41
 Consequently, taken a step further, it is clear that without a reversal for a new trial as to all defendants, this court cannot fashion a remedy for plaintiffs as to the erroneous grant of judgment as a matter of law to Nance. Plaintiffs argue that the district court's grant of judgment as a matter of law in favor of Nance, and the court's limitation on the scope of counsels' closing arguments "fatally jeopardized the case against the remaining defendants," thus warranting a new trial against all defendants. Appellants' Br. at 32. We do not agree.
 
 
 42
 On appeal, we review the district court's denial of plaintiff's motion for new trial for an abuse of discretion. Mayhue v. St. Francis Hosp. of Wichita, Inc., 969 F.2d 919, 922 (10th Cir.1992). The district court may set aside a jury verdict only when it is convinced that the verdict is "against the weight of the evidence or when prejudicial error has entered the record." McHargue v. Stokes Div. of Pennwalt Corp., 912 F.2d 394, 396 (10th Cir.1990).
 
 
 43
 Here, the motion for judgment as a matter of law was granted at the end of plaintiffs' case, after the jury had the opportunity to hear all of the evidence regarding Nance's alleged discriminatory disposition and influence on the hiring process. The jury was not precluded from considering and weighing plaintiffs' evidence against Nance in their decision as to the liability of the remaining defendants. Therefore, the grant of judgment as a matter of law to Nance, although error, was not prejudicial to the jury's verdict in favor of the other defendants.
 
 
 44
 Equally unavailing is plaintiffs' argument that the trial court's limitation on counsels' ability to include references to Nance's alleged discriminatory involvement in closing arguments so prejudiced the jury verdict that a new trial is warranted. Plaintiffs predicate their claim of prejudicial error on their assertion that "the jury was prevented from understanding the discriminatory nature of the hiring decision." Appellants' Br. at 32. However, because plaintiffs failed to properly object at the time of this ruling, we can review the record only for plain error. See Denison v. Swaco Geolograph Co., 941 F.2d 1416, 1422 (10th Cir.1991).
 
 
 45
 In a civil case, "[t]he 'plain error' exception ... has been limited to errors which seriously affect 'the fairness, integrity or public reputation of judicial proceedings.' " McEwen v. City of Norman, 926 F.2d 1539, 1545 (10th Cir.1991)(quoting Karns v. Emerson Elec. Co., 817 F.2d 1452, 1460 (10th Cir.1987)). The "miscarriage of justice" must be "patently plainly erroneous and prejudicial." Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 738 F.2d 1509, 1516 (10th Cir.1984), aff'd 472 U.S. 585 (1985).
 
 
 46
 This case lacks sufficient indicia of prejudicial effect. Therefore, the district court's error in granting judgment as a matter of law to Nance, and the district court's ruling limiting the content of closing arguments do not rise to the level of plain error, and are harmless. See Fed R. Civ. P. 61 (a trial error is harmless if it does not affect "substantial justice" or the "substantial rights of the parties").
 
 
 47
 Accordingly, the judgment of the United States District Court for the District of New Mexico is AFFIRMED.
 
 
 
 **
 Honorable John L. Kane, Jr., Senior District Judge, United States District Court for the District of Colorado, sitting by designation
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 The version of Rule 50(a) which became effective on December 1, 1991, abandons the "directed verdict" nomenclature in favor of "judgment as a matter of law." However, the existing standard, articulated in long-standing case law, remains unchanged. Rule 50 advisory committee's note
 
 
 [3]
 Although the record does not contain the relevant pleadings or the district court's order, defendants' motion for judgment as a matter of law states that the district court had previously denied defendants' motion for summary judgment based on its conclusion that plaintiffs had stated a prima facie case of discrimination. See Appellants' App. Vol. I at 26. This determination is not before us on appeal
 
 
 [4]
 Kathleen McGhee (Long), another Caucasian employee of Western States Management, also was not hired. Defendants claim that McGhee was offered a job, but turned it down because it conflicted with her schedule at a second job she was working. McGhee claims she was never offered a job. Although she is not a party to this action, the record indicates that she brought a separate law suit against the defendants
 
 
 [5]
 A deposition of Charles Puckett was taken on May 13, 1991. It was submitted to Puckett for changes and corrections and a sealed copy was filed with the court on December 31, 1991. On March 20, 1992, Puckett made extensive substantive changes to the deposition. The court ruled that the changes were outside the thirty days allowed and that the sealed copy without the changes would be used. Appellants' App. Vol. II(B) at 236-37
 
 
 [6]
 Portions of Kerry Love's deposition were admitted at trial, and read into the record, but were not included in the trial transcript. See Appellants' App. Vol. II(C) at 420. Only very limited excerpts were provided this court in the appellate record. Appellants' App. Vol. I at 38-40
 
 
 [7]
 Although plaintiffs argue that Nance was in a position to influence KCA's hiring decisions, they do not assert than Nance had any actual hiring authority which would place her in an employer category for purposes of liability under Title VII